UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
                              :

WILLIAM F. RAEDLE,               :     Case No.: 04-CV-2235 (TPG)

               Plaintiff,     :

                              :

       -against-           :

                              :

CREDIT AGRICOLE INDOSUEZ,   :
DANIEL H. SMITH and LEE SHAIMAN,  :

               Defendants.  :
---------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO FOR SUMMARY JUDGMENT

David A. Berger (DB-1312)
Kevin L. MacMillan (KM-2525)
ALLEGAERT BERGER & VOGEL LLP
111 Broadway, 18th Floor
New York, New York 10006
(212) 571-0550

Attorneys for Defendants
Credit Agricole Indosuez, Daniel H. Smith
and Lee Shaiman

## TABLE OF CONTENTS

**page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     RAEDLE CANNOT ESTABLISH HIS CLAIM FOR A RETROACTIVE SALARY
INCREASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    RAEDLE CANNOT ESTABLISH HIS BONUS CLAIM . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.    Raedle Cannot Use Parol Evidence to Vary the Agreement . . . . . . . . . . . . . . . . 2

     B.    Raedle's 2000 Bonus Was Contingent on His Continued Employment . . . . . . . . 4

     C.    Raedle Waived His Bonus Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   RAEDLE CANNOT ESTABLISH HIS CLAIM FOR
TORTIOUS INTERFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.    Raedle's Claim Depends on Inadmissible Hearsay . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.    Raedle Fails to Introduce Evidence Showing "Wrongful Means"
or "Malice" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF AUTHORITIES

### Cases

**page**

Berhanu v. N.Y.S. Ins. Fund,
1999 WL 813437 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Burlington Coat Fac. Whse. Corp. v. Espirit De Corp,
769 F.2d 919, 924 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Burns Jackson Miller Summit & Spitzer v. Lindner,
59 N.Y.2d 314 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Carvel Corp. v. Noonan,
3 N.Y.3d 182, 190 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ershow v. Site Hldgs., Inc.,
1995 WL 384457 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Freedman v. Pearlman,
271 A.D.2d 301, 303 (1st Dep't 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Hanlon v. McFadden Pubs.,
302 N.Y. 502 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Horowitz v. La France Indus.,
274 A.D. 46 (1st Dep't 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Laskey v. Rubel Corp.,
303 N.Y. 69 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Miller v. COE Labs., Inc.,
1986 WL 15360 (E.D.N.Y. 1986) (McLauglin, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Miteva v. Third Point Mgmt. Co.,
323 F. Supp. 2d 573 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Murphy v. Am. Home Prods. Corp.,
58 N.Y.2d 293, 300 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ii

**page**

Myskina v. Conde Nast Pubs.,
386 F. Supp. 2d 409 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Patane v. Griffin,
164 A.D.2d 192, 196 (3d Dep't 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Smalley v. Dreyfus Corp.,
40 A.D.3d 99, 106 (1st Dep't 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

U.S. v. Montejo,
442 F.3d 213, 215 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Waldman v. Englishtown Sportswear, Ltd.,
92 A.D.2d 833 (1st Dep't 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Whitton v. Gen. Elec. Co.,
200 A.D.2d 924, 924-25 (3d Dep't 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

Zolotar v. New York Life Ins. Co.,
172 A.D.2d 27, 31-32 (1st Dep't 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

## ARGUMENT

### I.   RAEDLE CANNOT ESTABLISH HIS CLAIM FOR A RETROACTIVE SALARY INCREASE.

Plaintiff William F. Raedle ("Raedle") misreads this Court's observation that an oral

agreement to raise his salary to $125,000 is not barred by the written contract (see Raedle Br. at 16).

While the Court suggested on a motion to dismiss that Raedle *may* prove such a claim, the fact is that

on summary judgment Raedle *has failed to do so*.  To be sure, Raedle testified that he was promised a

salary increase.  What he did not testify, however, is that he was promised employment for a definite

term to vary the Employment Agreement's provision that his employment was at will: "Both the Bank

as employer and you as the employee have the option of terminating the employment relationship at

any time, with or without reason."  See Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 300

(1983) ("where an employment is for an indefinite term it is presumed to be a hiring at will which

may be freely terminated by either party at any time for any reason or even for no reason").

Raedle claims he was entitled to an increase in January 2000.  He did not receive that increase,

but continued to work for CAI until he was fired in January 2001.  Therefore, because he was an

employee at will, Raedle has waived any right to an increase:

> Under New York law, if an employer informs an at-will employee that his employment
> contract is to be prospectively altered and the employee continues to work after the offer is
> disclosed, the result is either a new hiring or a rehiring based on the terms contained in the
> offer.

Miller v. COE Labs., Inc., 1986 WL 15360 (E.D.N.Y. 1986) (McLauglin, J.); accord Ershow v. Site

Hldgs., Inc., 1995 WL 384457 (S.D.N.Y. 1995) ("In view of the at-will relationship, the parties also

were free to alter the terms of employment at any time.").  As the First Department explained:

> Were plaintiff dissatisfied with the new arrangement, he would have had a perfect right to
> leave his employment. However, he accepted the new terms and continued in his position. His
> acceptance of the new scale of compensation amounted to an assent on his part.

Horowitz v. La France Indus., 274 A.D. 46 (1st Dep't 1948) (affirming compensation reduction).

Thus, the uncontested fact that Raedle was employed at will requires dismissal of his salary claim. For example, in <u>Waldman v. Englishtown Sportswear, Ltd.</u>, 92 A.D.2d 833 (1st Dep't 1983), plaintiff alleged that defendants promised that his commission rate would not be reduced. Defendants reduced the rate, and plaintiff continued in defendants' employ. The court granted summary judgment dismissing plaintiff's contract claim:

> The record demonstrates that defendant Englishtown determined in June 1980 to reduce the commission rate from 6% to 4% prospectively and offered to, in effect, rehire plaintiff Waldman at such new rate. Plaintiff did not have to accept this new hiring, but was free to refuse such employment. As noted by the Court of Appeals, the change in the commission rate under these circumstances results in a new hiring or a rehiring.

92 A.D.2d at 835 (citing <u>Hanlon v. McFadden Pubs.</u>, 302 N.Y. 502 (1951)).

## II.    RAEDLE CANNOT ESTABLISH HIS BONUS CLAIM.

A.    <u>Raedle Cannot Use Parol Evidence to Vary the Agreement.</u>

The bonus provision of Raedle's employment agreement provides in part:

> Based on your performance contribution and the profitability of Indosuez Capital, you will be eligible to participate in a bonus pool generated from the activities of the group.

Again, while the Court offered Raedle an opportunity to prove a claim consistent with the written agreement, he has failed to do so, because his theory is barred by the parol evidence rule, which provides that parol evidence may *clarify* ambiguities in, but *not vary* the terms of, a contract:

> Even where an agreement is not completely integrated -- meaning that the writing was intended by the parties to be a final and complete expression of all the terms agreed upon--parol evidence may be admitted only to complete the agreement or to resolve some ambiguity therein, and not to vary or contradict its contents.

<u>Myskina v. Conde Nast Pubs.</u>, 386 F. Supp. 2d 409 (S.D.N.Y. 2005); <u>accord</u> <u>Laskey v. Rubel Corp.</u>, 303 N.Y. 69 (1951) ("It is well settled that, where parties have reduced their bargain, or any element of it, to writing, the parol evidence rule applies to prevent its variance by parol evidence. If, therefore, the agreement is partly oral and partly written, parol evidence, while admissible to complete the written portion or to resolve some ambiguity therein, may not be used to vary or contradict its

2

contents.").

Raedle improperly seeks to vary the agreement by negating the words "[b]ased on your performance contribution". One can imagine -- and the Court on a motion to dismiss may have imagined -- that the parol evidence rule would permit Raedle to introduce evidence clarifying "performance contribution" -- for example, if he testified to a promise that his performance would entitle him to a bonus if he worked so many hours or brought in so much revenue.[1] But Raedle offers no such evidence. Rather, his claim is that "Smith told Raedle that he would be paid a bonus equal to a minimum of one hundred percent of Raedle's base salary" (Raedle Br. at 16). In other words, Raedle's testimony is that there was an oral agreement that a bonus of at least his base salary was *automatic* -- in other words, that his "performance contribution" was entirely irrelevant to his entitlement to a bonus. As such, Raedle's evidence is barred by the parol evidence rule.

The alleged oral promise to guarantee Raedle a minimum bonus whatever his performance is similarly barred by CAI's employee handbook, which provides that bonuses are discretionary.[2] "[E]ven if the defendants promised the plaintiffs performance fees in 2003, the language in the Employee Handbook indicating that the defendants had the authority to 'modify or annul any individual award, at their sole discretion, with or without notice, at any time' renders untenable the plaintiffs' claim for a portion of the performance fee." Smalley v. Dreyfus Corp., 40 A.D.3d 99, 106 (1st Dep't 2007).

---

[1] To be enforceable as a restriction on CAI's discretion to evaluate Raedle's performance contribution, the agreement would have had to include some sort of objective criteria by which his performance could be measured. Freedman v. Pearlman, 271 A.D.2d 301, 303 (1st Dep't 2000) (dismissing claim based on promises to provide "fair compensation" and to "equitably" divide draw as "too indefinite to be enforced"); Whitton v. Gen. Elec. Co., 200 A.D.2d 924, 924-25 (3d Dep't 1994) (where criteria for incentive award were time spent on project, potential amount of employee's influence, and overall performance, "we view the incentive award criteria as so subjective and indefinite as to render the program memorandum unenforceable by any individual program participant").

[2] Raedle misleadingly implies that the employee handbook does not provide that bonuses are discretionary. (See Raedle Br. at 3). In fact, the handbook is quite clear that bonuses are discretionary. (See Declaration of Michael F. Walsh, dated September 8, 2004, ¶ 5, Ex. 2 (attached as Ex. 1 to Reply Declaration of David A. Berger, dated August 7, 2007 ("Berger Reply Decl.")).)

Perhaps recognizing the untenability of arguing that he was entitled to a bonus regardless of performance, Raedle then argues that his performance was in fact good (Raedle Br. at 18-20). Raedle's argument fails because it is undisputed that *CAI judged his performance to be poor*, as documented by contemporaneous performance evaluations (see Raedle Br. at 7-8), not to mention that Raedle was ultimately terminated for poor performance. Raedle's response is to argue, incredibly, that there is a triable issue because *in his opinion his performance was good*. Raedle claims that his performance evaluations were poor because CAI used the wrong criteria to evaluate him (Raedle Br. at 19-20), that one of the authors of a memorandum setting forth reasons why he should be fired indicated that the memorandum was not complete or that the reason singled out as the most important might not have been the *most* important (implying that there were *more* reasons to fire him) (id.), and that other employees' criticisms were the result of bias (based on nothing more than that employees in his group competed for the same bonus pool) (id.). Raedle's argument is, frankly, the legal equivalent of demanding to grade one's own exam. Cf., e.g., Whitton, 200 A.D.2d at 925 (plaintiff failed to satisfy burden of establishing triable issue of entitlement to incentive compensation where "affidavit in opposition to the motion merely applauds his own performance and ability, portrays the scope of his involvement and responsibilities ... as far more expansive than that described by defendant, and communicates an expectation that he would be compensated in direct proportion to project underruns realized through his participation ...").[3]

    B.    <u>Raedle's 2000 Bonus Was Contingent on His Continued Employment</u>.

Raedle's claim for a bonus in 2000 also impermissibly reads out of the written agreement the express provision that any bonus was contingent on continued employment:

---

[3] While a court may look behind an employer's evaluation to assure that it was not discriminatory, even then "it is not the Court's role to second guess the employer's subjective evaluation of performance-only to determine whether the evidence supports an inference that the evaluation is merely a pretext for discrimination". <u>Berhanu v. N.Y.S. Ins. Fund</u>, 1999 WL 813437 (S.D.N.Y.). Here, of course, there is no claim of discrimination.

Bonus payments normally are payable within the first quarter following the performance year, contingent on active employment with the Bank at the time of bonus payment.

Raedle's effort to save his claim for a 2000 bonus misreads this provision. Raedle argues: "Instead, the Agreement prefaces the clause as to the timing of the bonus payments with the word 'normally,' which by definition assumes certain exceptions". Raedle is wrong because the word "normally" refers to the *timing* of the bonus, not to the requirement of continued employment, as demonstrated by (a) its placement immediately preceding the verb it modifies ("are payable"), see U.S. v. Montejo, 442 F.3d 213, 215 (4th Cir. 2006) ("as a matter of common usage, 'knowingly' does not modify the entire lengthy predicate that follows it. Simply placing 'knowingly' at the start of this long predicate does not transform it into a modifier of all the words that follow. Good usage requires that the limiting modifier, the adverb 'knowingly,' be as close as possible to the words which it modifies"), and (b) that it makes sense for the bank to give itself flexibility to pay bonuses after the first quarter, but there would be no reason to limit the employment contingency, as the bank could always make an exception if it deemed it to be in its business interests.

Out of this misreading, Raedle then conjures an "exception" out of whole cloth: "One obvious exception is where an employee is terminated after working an entire calendar year but before bonuses are paid." Raedle cites no law for this exception and fails to explain why it is obvious that CAI would make an exception to benefit employees terminated for poor performance (or, for that matter, why it should be of such great significance that Raedle was fired on January 11, rather than in December). In fact, there is no such exception. Zolotar v. New York Life Ins. Co., 172 A.D.2d 27, 31-32 (1st Dep't 1991) (employee terminated without cause not entitled to additional "incentive compensation analogous to a bonus" because terms expressly required employee to "continue to be employed by defendant").

5

C.   <u>Raedle Waived His Bonus Claims.</u>

As set forth in CAI's Opening Brief, Raedle waived his bonus claims by failing to assert that

he had a contractual right to a bonus, either during his employment or after (until this action).  As he

wrote in March 2001 (in a letter prepared with assistance of counsel): "Shortly after the year 1999

bonus payments, during February 2000, I informed [CAI executives] of my disbelief and

disappointment with my 1999-year bonus since the number did not reflect my experience or the

contribution stated in the review."  While Raedle tries to pass this off as "not particulariz[ing] claims"

(Raedle Br. at 20), there can be no doubt that by failing to raise his alleged oral agreement when

disputing his bonus in February 2000 and again in March 2001, Raedle knowingly and intentionally

relinquished any rights under that agreement.  Further, Raedle's claim to a 2000 bonus is also waived

for the reasons set forth in Section I, above, because as an at-will employee he continued to work

throughout 2000 even after learning he would not be receiving bonuses of at least his base salary.

## III.   RAEDLE CANNOT ESTABLISH HIS CLAIM FOR TORTIOUS INTERFERENCE.

Raedle cannot establish the "wrongful means" or "malice" element of his claim for tortious

interference with prospective contractual relations.  The "facts" that Raedle relies upon are not only

substantively insufficient, but are also largely inadmissible.  Notably, while Raedle repeatedly argues

Shaiman "disparaged" him to Dreyfus, there is no admissible evidence supporting this claim -- let

alone <u>any</u> evidence of what was said during Shaiman's alleged conversation with Dreyfus.

A.   <u>Raedle's Claim Depends on Inadmissible Hearsay.</u>

Faced with a complete void of evidence of what Shaiman actually said during his alleged

conversation with Dreyfus -- and at best an inference from Balakrishnan's testimony that something

negative was said -- Raedle relies on hearsay from Thunelius' deposition that whatever was said was

of a "personal nature".  Not only is this testimony insufficient to prove tortious interference, it is

simply inadmissible hearsay and cannot be used to establish the content of the conversation.

Thunelius <u>did not</u> testify that he spoke with Shaiman and that Shaiman made negative comments of a "personal nature" about Raedle.  Rather, Thunelius testified that he spoke with *Leibig* who told him that she or one of her staff had spoken with Shaiman who had made comments about Raedle which, Thunelius concluded, were of a personal nature, <u>see</u> Raedle Br. at 12 ("And the things she [Leibig] had repeated to me at the time seemed, in my opinion, like garbage and I thought they were personal things") (quoting Thunelius), even as Thunelius admitted "I don't recall exactly what [the personal things] were" (Thunelius Dep. 28).[4]  Even if Thunelius had recalled what Leibig said Shaiman said, and even if what he recalled would have been enough to support a claim for tortious interference, his testimony would be inadmissible hearsay.  Raedle seeks to introduce Thunelius's recounting of what Leibig said to prove the truth of the matter -- namely, that Shaiman actually told Leibig (or her assistant) what Leibig said he said, <u>i.e.</u>, that Shaiman really said something of a personal nature to her or her staff.[5]  This is rank hearsay as to which no exception applies.  Given the inadmissibility of Thunelius' testimony, Raedle cannot rely on it to defeat summary judgment, and his opposition -- which depends dispositively on the inferences he would have the jury draw from Thunelius' testimony -- necessarily fails.  <u>See</u> <u>Burlington Coat Fac. Whse. Corp. v. Espirit De Corp</u>, 769 F.2d 919, 924 (2d Cir. 1985) (plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial") (citations omitted).[6]

---

[4] Compounding the prejudice if this hearsay were admitted, neither Leibig nor Thunelius remembers what Leibig purportedly said Shaiman had said about Raedle.  Indeed, Leibig testified she has no recollection of any conversation she had with Shaiman, or anyone at CAI, or even whether it was she or one of her staff who spoke with CAI.  <u>See</u> Opening Br. at 11 n.9.

[5] Raedle also seeks to introduce in his opposition a transcript of a tape recording that Raedle secretly made of conversations he had with Leibig many months after his interview with Dreyfus.  This, too, is inadmissible hearsay given that Raedle seeks to introduce what Leibig said on the tape -- namely, that she had spoken with "two folks" at CAI and had been referred to Raedle's "line managers" -- to establish that Leibig actually did.  In any case, at most this tape could establish that Leibig rather than her assistant spoke to CAI, which would make Thunelius' testimony ordinary hearsay rather than double hearsay.

[6] Beyond the insurmountable hearsay problem, Thunelius' testimony would be inadmissible to prove the

B.    Raedle Fails to Introduce Evidence Showing "Wrongful Means" or "Malice".

Because there is no evidence of what (if anything) Shaiman actually said to Dreyfus, Raedle cannot show "wrongful means" or "malice".

First, given the lack of evidence concerning Shaiman's conversation with Dreyfus, Raedle has retreated from his initial allegation that the "wrongful means" that Shaiman engaged in was "misrepresenting" Raedle's employment at CAI (see Amended Complaint ¶ 62) and instead now claims Shaiman's conversation with Dreyfus satisfies the "wrongful means" prong of his claim because it constitutes a *prima facie* tort.  Given that a *prima facie* tort claim requires "malice"[7] -- and establishing "malice" is a necessary element of a tortious interference claim when "wrongful means" ("criminal or independently tortious" conduct) cannot be established -- Raedle *must* make a showing sufficient to demonstrate "malice" if his tortious interference claim is to survive.  As set forth below, he cannot.

Second, Raedle cannot prove that Shaiman "acted with the sole purpose of harming the plaintiff" as he offers no evidence of what Shaiman's alleged "act" -- the substance of his conversation with Dreyfus -- was.  Raedle attempts in his opposition to rewrite this tort by attempting

---

contents of Shaiman's alleged conversation with Dreyfus under FRE 403 and 701 because it improperly seeks to introduce Thunelius' testimony that the comments reported to him were "personal" (in his opinion) to have the jury conclude both (a) the comments were actually "personal" (in an objective sense) and (b) the comments were tortious, despite the complete lack of evidence as to their content.  Plainly, not every comment of a "personal nature" is an inappropriate response to a request for a job reference -- far less tortious interference.  For example, in Smith's and Shaiman's December 4, 2000 memorandum setting forth reasons to terminate Raedle, they state that Raedle "continues to remain aloof and a poor communicator".  While this criticism does not address Raedle's technical skill as an analyst -- and is arguably personal in nature -- it is a perfectly appropriate subject for a job reference, as interaction with superiors, co-workers, and subordinates is an important job skill.

[7] In Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314 (1983), the Court of Appeals held that "there is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act or, in Justice Holmes' characteristically colorful language, unless defendant acts from 'disinterested malevolence', by which is meant that the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another".  Id. at 333 (citations omitted); see also Patane v. Griffin, 164 A.D.2d 192, 196 (3d Dep't 1990) (summary judgment on *prima facie* tort where "plaintiff has not established that malevolence was the sole motive for defendants' otherwise lawful acts"; citations and internal quotations omitted).

to separate the "malicious act" element into two components: (i) an "act" that damages plaintiff; and (ii) a general allegation that defendant held "malice" toward plaintiff. This is not the tort, as the analysis is not whether defendant had general malice toward plaintiff but whether "defendant engages in conduct for the sole purpose of inflicting intentional harm". Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004). Malice is explicitly linked to the otherwise lawful conduct, and is not something that can be proven separate and apart from the conduct.[8] For example, in Miteva v. Third Point Mgmt. Co., 323 F. Supp. 2d 573 (S.D.N.Y. 2004), a former employer (Loeb) *initiated* a call with the former employee's prospective employer (Conheeney) -- after declining to give relevant employment details in response to a previous unsolicited call -- and misrepresented to the prospective employer that the former employee (Miteva) had lost money for his company. The court stated:

> The facts on the record here indicate that it was Loeb who initiated the call to Conheeney after Loeb had talked to Patty [who also worked at the prospective employer] and declined to give any details about Miteva's employment. At the time of that call, Conheeney was not even aware of who Miteva was. What Loeb may have had in mind in pursuing this course of action raises substantial questions about the nature of his motive. Miteva has created an issue of fact by challenging Loeb's alleged motive in contacting Conheeney.

Id. at 587. The analysis in Miteva was whether Loeb was motivated by malice in *initiating* the call with Conheeney (wherein he made specific, false statements about plaintiff), not whether he had general malice toward Miteva. Here, given that Shaiman's alleged call with Dreyfus was *unsolicited* (and there is no evidence that he said anything false or otherwise improper), Raedle has failed to offer sufficient evidence from which the jury can infer malice.

Third, even if a general allegation that Shaiman held malice toward Raedle could suffice, Raedle cannot prove even generalized malice for at least three reasons:

1. Shaiman's statement that he did not have a "pleasant" working relationship with Raedle fails as a matter of law. Tortious "malice" means to act with the sole purpose of inflicting harm, not to harbor dislike toward another. Indeed, if proving malice were that easy, it would be

---

[8] Otherwise, anyone who harbored a general dislike or animus toward another would be exposed to liability for any act that harmed that person, even if the act was not itself wrongful.

established in nearly every case. Cf. Miteva, 323 F. Supp. 2d at 575 (former employee writes of his analysts, "I hate them intensely").

2.      Raedle argues Shaiman has reason to retaliate against him because Raedle sent a March 2, 2001 letter to CAI's Branch Manager Didier Varlet claiming that Smith and Shaiman were leaving CAI with a number of other employees. Shaiman's conversation with Dreyfus allegedly took place on or around March 20, 2001. The inference Raedle advances is that Varlet received the March 2 letter, confronted Shaiman, and as a result Shaiman retaliated against Raedle. The problem with Raedle's theory is that he offers no evidence beyond the mere existence of the letter. In fact, (i) Gruenhut testifies that the likelihood that Smith and Shaiman were made aware of Raedle's letter to Varlet was "extremely low, if not totally unlikely" (Gruenhut Tr. at 107 (attached as Ex. 3 to Declaration of Ethan A. Brecher, dated June 28, 2007 ("Brecher Decl."))); and (ii) Smith and Shaiman testify that they never saw the letter until this case began (Shaiman Tr. at 162 (Berger Reply Decl., Ex. 2); Smith Tr. at 212-213 (Brecher Decl., Ex. 3)). (Raedle had the opportunity to depose Varlet but declined to do so (Berger Reply Decl., Ex 4).)[9]

3.      Raedle's allegation that Shaiman failed to provide a non-malicious motive for his conversation with Dreyfus is simply false. Indeed, while Shaiman testified that he never had this conversation, Balakrishnan testifies that the alleged conversation Shaiman had with Dreyfus came about in response to a call to Shaiman from Dreyfus and Shaiman testified that in response to an employment inquiry from Merrill Lynch (after Shaiman left CAI) his motivation in discussing Raedle was answering truthfully to protect his own reputation (Shaiman Tr. at 206 (Berger Reply Decl., Ex. 2)).

## CONCLUSION

For the reasons set forth above and in Defendants' Opening Brief, summary judgment should be granted in favor of Defendants.

Dated: New York, New York
        August 7, 2007

Respectfully submitted,

ALLEAGERT BERGER & VOGEL LLP

David A. Berger (DB-1312)
Kevin L. MacMillan (KM-2525)
111 Broadway, 18th Floor
New York, New York 10006
(212) 571-0550
Attorneys for Defendants

---

[9] Raedle's attempt to avail himself of the rule stated in Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001), that, in claims for retaliation, causal connection between protected activity and discharge "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action" is unavailing, given that Raedle does not assert a claim for retaliation.