UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
:
WILLIAM F. RAEDLE,                  :
:
            Plaintiff,              :       04 Civ. 2235 (TPG)
:
      - against -                   :       **OPINION**
:
:
CREDIT AGRICOLE INDOSUEZ, DANIEL    :
H. SMITH and LEE SHAIMAN,           :
:
            Defendants.             :
:
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/18/08

William Raedle brings this action against his former employer, Credit Agricole Indosuez ("CAI"), and two of his former supervisors, Daniel H. Smith and Lee Shaiman, alleging breach of contract and tortious interference with other prospective employment.

Raedle was a research analyst at CAI from August 1998 until he was terminated in January 2001. Plaintiff alleges that he is owed $250,000 in unpaid salary and bonus compensation. He further claims that following his termination, defendants tortiously interfered with his prospective employment at another company, and therefore, are liable for additional compensatory and punitive damages.

The original complaint was filed on March 19, 2004 and listed eleven claims for relief. At oral argument of an earlier motion, the court

dismissed nine of the claims: fraud, breach of implied-in-fact contract, quantum meruit, negligent misrepresentation, violation of New York labor laws, ERISA, and breach of contract regarding payment of severance. The court then determined that plaintiff had adequately pled the tortious interference claim, and that plaintiff could replead with greater specificity the salary and bonus compensation claims.

The first amended complaint was served on April 4, 2006, repleading the salary and bonus claims, and reiterating the tortious interference claim. Discovery has now been concluded, and defendants have moved for summary judgment.

The motion is denied, except that the tortious interference claim is dismissed as to defendant Smith.

## Facts

Raedle was hired by defendant Smith in August 1998 as an analyst in the Asset Management group of Indosuez Capital ("IndoCap"), a division of defendant CAI. Smith was a Managing Director and the Head of the Asset Management Area. Plaintiff entered into a written employment agreement with CAI, which contained the following provision:

> You will receive a base salary of $100,000 per annum, payable in equal semi-monthly installments, subject to any and all necessary withholdings and deductions for income taxes, F.I.C.A. and similar items. Based on your performance contribution and the profitability of Indosuez Capital, you will be eligible to participate in a bonus pool generated from the

> activities of the group. For performance during 1998, you will receive a pro-rated bonus for the partial year's work. Bonus payments normally are payable within the first quarter following the performance year, contingent upon your active employment with the Bank at the time of bonus payment. . . . Both the Bank as employer and you as the employee have the option of terminating the employment relationship at any time, with or without reason.

Plaintiff contends that prior to signing this document and joining CAI, Smith orally represented to plaintiff that:

(1) within a year, he would be promoted to vice president and his base salary would rise to $125,000 per year;

(2) his bonus potential was unlimited; that in good years his bonus would be multiples of base salary; and that he would receive a minimum bonus equal to one year of base salary in bad years; and

(3) bonuses were based upon plaintiff's job performance.

Defendants contend that evidence of this alleged conversation is inadmissible under the parole evidence rule. This issue will be discussed later. The contract did not contain an explicit integration clause.

At his deposition on January 25, 2007, Smith stated that he had no specific recollection about any discussions he had with Raedle concerning the terms of his employment, including compensation, promotion, or bonuses. However, he did state that he assumes they would have discussed these items.

The general counsel of CAI, Michael F. Walsh, stated in a declaration dated September 8, 2004, that while he was not involved in the hiring of plaintiff, it has been "the consistent practice of the Bank to put all offers of employment in a written agreement (including, specifically, all financial terms), which if accepted, is then countersigned by the prospective employee."

Regarding bonuses, the CAI Policy Manual states:

> When business conditions permit, the Bank may, at its discretion, award performance bonuses. Bonus amounts and the number of employees who are granted bonuses may be affected by the profitability of the Bank and other factors, as determined by and at the sole discretion of management. If a bonus award is granted, it typically is awarded in the first quarter of the year for job performance that occurred in the preceding year and reflects both individual performance and the bank's performance. The amount and timing of pay-out for any bonus award is at management's discretion. To be eligible to receive a bonus payment, an employee must be employed by the Bank as of the date the bonus is paid.

For the 1998 and 1999 calendar years, plaintiff received performance evaluations. The parties dispute whether these evaluations were positive or negative. Plaintiff cites portions of the 1998 evaluation discussing plaintiff's "sharp research" and "good critical thought and ability to quickly identify key investment issues." Plaintiff also emphasizes that he was given a "commendable" rating for 70% of the categories on his 1998 evaluation and "satisfactory" in the other 30% of

the categories. Plaintiff also notes that he was considered for promotion to Head of Research in fall 1999 as evidence of his good performance.

Defendants, however, allege that his 1999 performance was inadequate, citing portions of his evaluation that discuss his poor communication skills and inadequate documentation of work. Plaintiff acknowledges the criticism in his 1999 evaluation concerning a lack of written work product. But plaintiff states that much of this criticism related to a new "Responsibilities/Objectives" section in the evaluation that explained how performance would be measured from that point on, and plaintiff argues that he was unfairly judged in this evaluation using these new standards, which he had not been notified would be used to measure his performance. Plaintiff states that he complained to Smith, Shaiman, and Gruenhut of this unfairness in February 2000.

In December 1999, Smith hired defendant Lee Shaiman to serve as Head of Research of CAI's Asset Management group. Thereafter, plaintiff reported to Shaiman.

Plaintiff claims that he was given no notice that his performance was deficient through at least November 2000. At a meeting in November 2000, Smith and Shaiman informed plaintiff of deficiencies in his performance, and plaintiff denied such deficiencies. A memorandum dated December 4, 2000 from Smith and Shaiman to Allen Gruenhut, CAI's then head of human resources, discussed reasons to terminate plaintiff. It cited in part an "aloofness and unwillingness to report

regularly and pro-actively on his portfolio of credits" and a failure to train subordinates.

Plaintiff was terminated on January 11, 2001 at a meeting with Smith and Shaiman. In a letter-agreement dated January 11, 2001, CAI offered plaintiff severance in the amount of $33,333.36, or a third of a year's salary, in exchange for a release of all claims. Plaintiff asserts that he did not sign the letter-agreement. However, plaintiff was terminated effective January 31, 2001, and he was paid through that date.

During the time of plaintiff's employment, his salary was never raised above $100,000. In 1999, he was paid a pro-rated bonus of $35,000 for the calendar year 1998. In 2000, he was paid a bonus of $50,000 for the calendar year 1999. He was not paid a bonus for the calendar year 2000. Plaintiff contends that at the January 11, 2001 meeting at which Smith and Shaiman met with plaintiff to terminate his employment, they promised him that he would be paid a bonus for the calendar year 2000, despite his not being employed at the time bonuses were to be paid.

On March 2, 2001, following plaintiff's termination, plaintiff wrote a letter to CAI stating:

> I am gravely disappointed that I was fired by Lee Shaiman and Dan Smith. I was appalled by my year 1999 bonus. I believed that I was doing an excellent job as a senior analyst within the Asset Management team . . . . Shortly after the year 1999 bonus payments, during February 2000, I informed Mike Walsh and Alan Gruenhut of my disbelief and disappointment with my 1999-year

> bonus since the number did not reflect my experience or the contribution stated in my review.

The letter also informed CAI that Smith, Shaiman, and another employee were planning to leave CAI and take business with them. In the letter, plaintiff suggested that his termination and bonus payments were a result of this "coup."

Plaintiff alleges that after his termination, defendants tortiously interfered with his prospective employment with another firm. The complaint alleges that, out of "spite, malice, or ill will, Smith and Shaiman, acting in consort with each other and/or CAI and/or on CAI's behalf, or alternatively, in aiding and abetting CAI, conspired to interfere with Raedle's prospective employment and employment agreement with Dreyfus through misrepresenting his employment with CAI." As a direct result of this interference, Dreyfus declined to hire Raedle, who as a consequence suffered substantial loss of income.

According to uncontested evidence presented by plaintiff, soon after his termination, plaintiff applied for a position at Dreyfus. He interviewed with numerous Dreyfus employees, including Gerald Thunelius, a proprietary trader, portfolio manager and Director of Taxable Fixed Income at Dreyfus. If hired, Thunelius would have been plaintiff's supervisor. According to Thunelius' deposition, after he and other members of his group met with, and approved of plaintiff, he obtained approval from his manager to hire Raedle and put together a

compensation package. Raedle states that Thunelius extended him a verbal offer over the telephone, subject to a background check. Thunelius stated at his deposition that plaintiff had successfully interviewed with him and others, and that basically all that was left was a Human Resources background check.

Lauri Molino, then a Human Resources employee at Dreyfus, prepared a request for approval of plaintiff's employment and a draft letter offer, which stated that upon joining Dreyfus, Raedle would be paid a salary of $165,000, be eligible for an incentive compensation plan, with a guaranteed incentive payment of $150,000 for the year 2001 payable in February 2002, and be eligible to participate in a stock option plan.

When a Dreyfus Human Resources employee, apparently Molino, first attempted to confirm that plaintiff was previously employed with CAI, she was advised that CAI had no record of his employment. On or about March 21, 2001, Thunelius left Raedle a voicemail stating that CIA would not confirm plaintiff's employment at CAI to Dreyfus. However, someone from Dreyfus later called again and was able to confirm plaintiff's past employment with a CAI employee.

According to plaintiff, the CAI employee then suggested to someone at Dreyfus that they contact Raedle's former line managers. In Thunelius' deposition, he referred to Mary Beth Leibig, a Dreyfus Human Resources executive and Molino's supervisor. Thunelius testified that Leibig contacted a superior of Raedle at CAI, who said something that

"was enough to make her [Leibig] want to rescind Will from joining us," and it sounded to Thunelius like "what was being said to her were things of a more personal nature about Will himself, not about his skill set." He stated that Leibig said she "could not sign on to the hiring of Will." Thunelius testified that while he cannot remember exactly what Leibig said that Raedle's boss at CAI had said, "the things she had repeated to me at the time seemed, in my opinion, like garbage and I thought they were personal things."

Thunelius then testified that because the situation with Raedle was a "setback," he requested that he himself be permitted to contact Raedle's former superior. Leibig agreed, and he made the call. In his deposition, Thunelius did not state the name of the "boss" that he contacted, but that this person stated that "I thought that I had told everything that needed to be said to your HR person." Thunelius further stated at his deposition that after that conversation, he realized that he needed to find someone else for the position.

Shaiman, who was Raedle's manager, has no recollection of having any conversation with Dreyfus concerning Raedle, and testified that he was unaware that Raedle had applied for a job there. At his deposition, Shaiman stated he had "no recollection of ever receiving a query from Dreyfus and I do not believe I ever received a query from Dreyfus. Therefore, I didn't tell anyone about it, because it didn't happen."

By contrast, Raedle's former colleague, Mr. Sriram Balakrishnan, testified that after Raedle's termination, he entered Shaiman's office and Shaiman told him that "someone had called asking about. . . Will for a job reference" and that "after awhile he told them – Will is not going to be getting the job." Balakrishnan also stated that, to the best of his recollection, he asked what firm it was, and Shaiman said that it was Dreyfus.

CAI's policy concerning requests for references is as follows, as set forth in the CAI Policy Manual:

> Only the Human Resources Department (or the Legal Department, in some instances) is authorized to release information about an employee or former employee. Requests for references or information about any current or former employee should be referred for handling to the Human Resources Department, even though employees may feel qualified to respond directly.

Gruenhut testified that it was CAI's practice to provide only verification of dates of employment and position titles, and that every employee had signed forms stating they had read and were aware of the policies in the CAI Policy Manual and would uphold the spirit of them. Shaiman stated that he was aware of the "request for reference" policy. He testified that if he had received any call from Dreyfus, he would have referred the call to Human Resources.

Plaintiff alleges that a potential motive for the interference with his employment at Dreyfus was the letter he wrote to CAI on March 2, 2001.

As already described, in this letter, he informed CAI that Smith, Shaiman, and another person were planning to leave CAI and take business with them. Smith, however, said he was questioned by CAI executives around February 12 – two weeks before this letter – about whether they were leaving CAI. Gruenhut also testified that he believed a conversation occurred with Smith, Shaiman, and one other person about their potential departure prior to receiving plaintiff's March 2 letter.

## Discussion

The rules regarding the treatment of summary judgment motions are well understood and have been summarized in many decisions.

Contract claims

Plaintiff's contract claims in the amended complaint are as follows: (1) $25,000 in unpaid salary for each of the years 1999 and 2000, based on the alleged oral promise of Smith that plaintiff's salary would be raised to $125,000; (2) at least $75,000 in additional bonus for the year 1999; and (3) at least $125,000 bonus for the year 2000.

In support of these claims, plaintiff relies on the alleged oral promises of Smith. Defendants contend that evidence of these promises is barred by the parole evidence rule.

The parole evidence rule applies to "integrated" contracts. A written contract is considered integrated when the parties intend it to constitute the complete and final expression of their agreement. An "integration clause" would normally demonstrate conclusively that a

contract is integrated. If, as in the present case, there is no such clause, the issue of whether a contract is integrated requires examination of the circumstances surrounding the creation of the written agreement. Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999). If a contract is not integrated, evidence can be admitted of additional contract terms so long as such terms do not contradict the written terms. All R's Consulting, Inc. v. Pilgrims Pride Corp., No. 06 Civ. 3601, 2008 WL 852013, at *12 (S.D.N.Y. Mar. 28, 2008).

In the present case, there is an issue of fact as to whether plaintiff's written employment agreement was an integrated contract. If it was not, then there is an issue of fact as to whether Smith made the promises on behalf of CAI he is said to have made. If he did, it would appear that they add to, but do not contradict, the written terms of the contract. That would be true of the promise of an increase in salary within a year, and the promise of bonuses of multiples of base salary in good years and a minimum of one year's salary in bad years. It should be noted that the claim as to Smith's promises is that Smith spoke of plaintiff's "bonus potential" and further stated that bonuses were to be based on plaintiff's job performance. All of this indicates factual issues which cannot be resolved on the present summary judgment motion.

Defendants contend that, under New York law, plaintiff waived his claim for a salary increase to $125,000, because he continued to work for CAI after he knew that he was not being given the increase. See

Miller v. COE Labs., Inc., No. 86 Civ. 275, 1986 WL 15360, at *1 (E.D.N.Y. 1986). However, there are factual issues as to whether there was or was not such a waiver. Defendants' claim regarding waiver as to the bonuses also raises factual issues.

The court concludes that summary judgment cannot be granted as to the contract claims.

Tortious Interference

As a preliminary matter, plaintiff's Memorandum in Opposition to the motion for summary judgment states:

> Raedle, however, does not object to Defendants' position that the tortious interference claim should be dismissed as against Smith, because the evidence as developed during discovery demonstrates overwhelmingly that it was CAI and Shaiman's actions that tortiously interfered with Raedle's employment opportunity at Dreyfus.

Thus the court grants defendant Smith's motion for summary judgment on this claim.

Plaintiff continues to assert his claim of tortious interference against the other defendants. The law surely permits a former employer to give an honest negative reference regarding a former employee to a new prospective employer. However, there can be tortious interference liability if the former employer acts for the sole purpose of harming the employee or uses "dishonest, unfair, or improper means." Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994); Lindner v. Int'l Bus. Machs.

Corp., No. 06 Civ. 4751, 2008 WL 2461934, at *12 (S.D.N.Y. June 18, 2008).

In the present case, the evidence now presented to the court is so murky as to what actually occurred between CAI and Dreyfus after plaintiff's termination as to indicate that issues of fact exist which must be further developed.

The court denies summary judgment on the tortious interference claim, except that this claim is dismissed as to defendant Smith for the reason stated earlier.

## Conclusion

Defendants' motion for summary judgment is denied except that it is partially granted as to Smith, as stated.


Dated: New York, New York
       Sept. 18, 2008

SO ORDERED

*[signature]*

Thomas P. Griesa
U.S.D.J.