UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                          :

WILLIAM F. RAEDLE,                   :

                              :

                     Plaintiff,   :      Case No.: 04-CV-2235 (TPG)

         -against-             :

                              :

CREDIT AGRICOLE INDOSUEZ,      :
DANIEL H. SMITH and LEE SHAIMAN,  :

                              :

                 Defendants.   :

---------------------------------------------------------x


## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN EVIDENCE

ALLEGAERT BERGER & VOGEL LLP
David A. Berger (dberger@abv.com)
Michael S. Vogel (mvogel@abv.com)
Cornelius P. McCarthy (cmccarthy@abv.com)
Kevin L. MacMillan (kmacmillan@abv.com)

111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

Attorneys for Defendants
Credit Agricole Indosuez and Lee Shaiman

## Table of Contents

Table of Authorities ........................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..........................................................................................................................2

I.     THE JURY MAY CONCLUDE THAT DEFENDANTS GAVE
RAEDLE AN HONEST, NEGATIVE JOB REFERENCE ..............................................2

II.    RAEDLE'S PERFORMANCE AT CAI IS RELEVANT AND
ADMISSIBLE .................................................................................................................5

      A.    Raedle's Performance Is Relevant to What Defendants May
Have Said to Dreyfus ...............................................................................6

      B.    Raedle's Performance Is Relevant to Defendants' State of Mind ........................8

      C.    Raedle's Performance Is Relevant to Damages .....................................................9

      D.    Raedle's Performance May Be Admissible as Rebuttal or
Impeachment Evidence .........................................................................................13

III.    SHAIMAN'S TESTIMONY CONCERNING HIS SON IS
RELEVANT AND ADMISSIBLE ................................................................................13

CONCLUSION ....................................................................................................................16

Table of Authorities

Cases

Burchfield v. CSX Transp., Inc.,
2009 WL 1405144 (N.D. Ga. May 15, 2009)..............................................................................16

Conn v. Young,
267 F.2d 725 (2d Cir. 1959).........................................................................................................3

Fuller v. Summit Treestands, LLC,
2009 WL 1874058 (W.D.N.Y. May 11, 2009)...........................................................................16

Harold v. Cendo,
131 F.3d 134, 1997 WL 734028 (4th Cir. 1997) .......................................................................16

Homkow v. Musika Records, Inc.,
2009 WL 721732 (S.D.N.Y. Mar. 18, 2009).............................................................................13

Iweala v. Operational Technologies Services, Inc.,
634 F. Supp. 2d 73 (D.D.C. 2009)...............................................................................................8

Matthews v. Wisconsin Energy Corp. Inc.,
534 F.3d 547 (7th Cir. 2008) .......................................................................................................9

Metz v. United Technologies Corp.,
754 F.2d 63 (2d Cir. 1985).........................................................................................................13

Reeves v. Sanderson Plumbing Prods.,
530 U.S. 133 (2000)......................................................................................................................3

Tramble v. Columbia University,
1999 WL 61826 (S.D.N.Y. Feb. 10, 1999) .................................................................................8

United States v. Bifulco,
2007 WL 1288214 (W.D.N.Y. May 1, 2007).............................................................................16

United States v. Forrester,
60 F.3d 52 (2d Cir. 1995) .............................................................................................................3

Weber v. Parfums Givenchy, Inc.,
49 F. Supp. 2d 343 (S.D.N.Y.1999) .............................................................................................4

White v. Nicholls,
44 U.S. 266 (1845).....................................................................................................................10

Zubulake v. UBS Warburg LLC,
382 F. Supp. 2d 536 (S.D.N.Y. 2005).........................................................................................11


Rules

Fed. R. Evid. 401 ...........................................................................................................9, 10, 14

Fed. R. Evid. 402 ...........................................................................................................9, 10, 14

Fed. R. Evid. 403 ...........................................................................................................9, 10, 14

Fed. R. Evid. 404 ...................................................................................................11, 12, 14, 15

Fed. R. Evid. 404, Notes of Advisory Committee on Rules (1975) ...........................................12

Fed. R. Evid. 501 ...................................................................................................................16


Treatises

1 McCormick On Evid. § 195 (6th ed.) .....................................................................................15

4A N.Y. Prac., Com. Litig. in New York State Courts § 80:69 (2d ed.) ....................................13

44 N.Y. Jur. 2d Disclosure § 25..............................................................................................16

Defendants Credit Agricole Indosuez ("CAI") and Lee Shaiman ("Shaiman") (together, "Defendants") respectfully submit this Memorandum of Law in opposition to Plaintiff William F. Raedle's ("Plaintiff" or "Raedle") Motion *in Limine* to Exclude Certain Evidence ("Plaintiff's Motion").

## PRELIMINARY STATEMENT

This case is scheduled for retrial because Plaintiff prevailed on his motion for a new trial, but lost his motion for judgment as a matter of law. Apparently unsatisfied with the opportunity to present his case to another jury, Plaintiff now asks this Court to place a heavy judicial thumb on the scales of justice, in the hope that critical defense evidence will be excluded and that only Plaintiff's interpretation of events will be placed before the jury. As set forth below, Plaintiff's Motion should be denied, as it is not supported by the Rules of Evidence and, if granted, would prevent Defendants from receiving a fair trial.

Now that the jury has definitely rejected Raedle's contract claim, this case focuses on what Defendants purportedly said to Dreyfus when Dreyfus contacted CAI for a job reference for Raedle. It is undisputed that someone at CAI said something to Dreyfus about Raedle. However, it is hotly contested both (a) <u>what</u> was said and by whom; and (b) whether what may have been said was said with sufficient <u>malice</u> to support a claim for tortious interference.

Plaintiff's claim depends dispositively on the testimony of Gerald Thunelius ("Thunelius"), who claimed at the first trial that Raedle's former "boss"[1] at CAI said that Raedle had mental issues (or something from which Thunelius drew that "inference"). Manifestly, it will be for the jury to decide whether to believe this testimony, which directly contradicts Thunelius's deposition. If the jury disbelieves Thunelius, it will presumably find for Defendants.

---

[1] While Thunelius does not recall the name of the person he says he spoke to, Plaintiff claims that Thunelius spoke to Shaiman.

However, even if it believes Thunelius, the jury will have to decide multiple issues of fact, including (as relevant to this motion) (a) what exactly was said; and (b) whether the speaker acted with malice.

As set forth below, the evidence challenged by Plaintiff goes to the core of these issues and, therefore, the case -- even if the jury believes Thunelius's trial testimony rather than his deposition -- and, accordingly, is admissible under applicable evidentiary principles.

## ARGUMENT

### I.     THE JURY MAY CONCLUDE THAT DEFENDANTS GAVE RAEDLE AN HONEST, NEGATIVE JOB REFERENCE.

In an argument comprising a single sentence, Plaintiff argues that "the Court should instruct Defendants that they cannot ask the jury to speculate that Shaiman's comments to Dreyfus were limited to an honest negative performance review because there is no such evidence in the record" (Pl. Br. at 5).  Of course, Defendants do not dispute the black-letter principle that neither side may ask the jury to *speculate* about anything.  However, even if the jury accepts entirely the credibility of Thunelius's testimony -- and there is substantial reason that it should not do so -- it may reasonably conclude that an honest negative job reference is precisely what Thunelius is describing.

As set forth in Plaintiff's Motion, Raedle's tortious interference claim is based on his characterization of Thunelius's testimony at the first trial that someone at CAI responded to a request for a job reference with statements to the effect that Raedle had "mental issues" and "may have used the word 'psychopathic' to describe plaintiff" (Plaintiff's Br. at 3).[2]  The jury is, of course, free to believe or disbelieve Thunelius's testimony, which was inconsistent with his deposition, where he claimed five times not to recall what was said about Raedle by CAI (Tr.

---

[2] In fact, Thunelius's testimony is that the word "psychopathic" was uttered by someone at Dreyfus, not someone at CAI (see Tr. at 480).

465-6, 466-7, 469-70, 472, 490-1).  See, e.g., United States v. Forrester, 60 F.3d 52, 63 (2d Cir.

1995) ("As a matter of law, '[t]he credibility of witnesses is exclusively for the determination by

the jury…'"; citation omitted); cf. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147

(2000) ("it is not enough … to *dis*believe the employer; the factfinder must *believe* the plaintiff's

explanation of intentional discrimination"; citation omitted).  However, if the jury does believe

the veracity of Thunelius's testimony -- and it must for Plaintiff's claim to succeed -- the jury is

entitled to all relevant evidence concerning the content and context of what was said.

        Contrary to Plaintiff's argument, there is record evidence that the alleged

comments attributed to CAI by Thunelius were -- or should reasonably have been interpreted as

-- "a truthful performance evaluation of Raedle's performance" (Pl. Br. at 3).  As an initial

matter, Thunelius's description of the meeting where he says Mary Beth Liebig ("Liebig")

reported on what CAI said about Raedle makes clear that Thunelius is not offering what he

claims to be a *verbatim* account of what CAI said, but rather is offering his own *interpretation* of

*Liebig's interpretation* of what CAI purportedly said:

> She said that she heard that significant things about Will, *what I interpreted as very
> personal things*, but they were disparaging and she couldn't recommend him be hired….

(Tr. at 453; emphasis added.)

> *There was a lot of inference, most of what she [Liebig] hung on*….  *Inference* to him
> being, eventually being a problematic employee for mental-type issues….

(Tr. at 454; emphasis added.)

> I can't recall exactly what she – what she said, was said to her….

(Tr. at 465.)  The jury, of course, is free to accept or reject Thunelius's inferences based on the

evidence as a whole.  Conn v. Young, 267 F.2d 725, 730 (2d Cir. 1959) (on remand, court below

should grant request for instruction that jury is "not bound to accept the statements or

conclusions of witnesses who testify to opinions, and you may reject such evidence if it conflicts with the inferences that you yourselves draw from the facts appearing in evidence.").

Moreoever, while Thunelius's stated *opinion* is that those comments were not relevant to Raedle's analytical skills (see, e.g., Tr. at 470 ("All I … cared about was can he get in there quickly and analyze bonds.  In my opinion he could but there were other things said to her which had an overriding factor on that."), his testimony as to what was said also supports the conclusion that the comments were very much about Raedle's performance and, in particular, about his ability to work with others and be a productive member of a team.  For example, Thunelius testified that CAI's remarks "might have been about his demeanor, *possibly about his style of working with people*" (Tr. at 479; emphasis added).  Likewise, he testified that CAI had said "that he would likely be *a problematic employee* for us if we were to hire him" (Tr. at 481; emphasis added).  Similarly, he testified that Dreyfus discussed the inference that Raedle "*would not be a good employee for Dreyfus*" (Tr. at 454; emphasis added), and that "he was a problem" (Tr. at 455-56).

While the above statements do not relate to Raedle's *technical expertise*, they do relate to his job skills and qualifications.  See, e.g., Weber v. Parfums Givenchy, Inc., 49 F. Supp. 2d 343, 357 (S.D.N.Y.1999) (employer's explanation that employee had a "poor attitude" and did not work well with co-workers was "sufficient to meet its burden" of articulating a legitimate non-discriminatory reason for adverse employment action).  At a minimum, it is clear that a jury could reasonably conclude, even accepting Thunelius's testimony, that Raedle's attitude and interpersonal skills, or lack thereof, had affected his job performance at CAI, leading to the reasonable inference that he "would not be a good employee for Dreyfus".

The inference that whatever may have been said could have amounted to nothing more than a negative job reference is supported by other evidence as well.  For example, Raedle's notes of his call with Liebig in June 2001 state that Dreyfus "talked to Lee Shaiman and Dan Smith.  Both provided *Bad references*."  (Tr. Exh. 26; emphasis added.)  Those notes also state, "Both what Dan [Smith] said and Lee [Shaiman] said were consistent."  (Tr. Exh. 26.)  Of course, the fact that what Shaiman supposedly said was consistent with what Smith supposedly said (and for which Plaintiff does not seek to hold Smith liable[3]) is compelling evidence that anything Shaiman may have said was job-related, rather than an intentional falsehood concerning Raedle's mental health.  Likewise, the inference that whatever may have been said was job-related is supported by Raedle's statement that "John Cooper",[4] a former Dreyfus executive, told him that "they found something really bad *in your employment file*" at CAI (Tr. Exh. 58 at 9; emphasis added).  Such an inference is supported by the fact that Mary Beth Liebig, the Dreyfus human resources manager who was also present at the meeting among Dreyfus personnel to discuss Raedle, did not recall what was said because it "wasn't a memorable event" (Tr. at 544). Clearly, a jury may reasonably infer that the fact that whatever may have been said was not "memorable" is evidence that it was more in the nature of a routine, negative job reference than a claim that a job applicant was "psychotic" or had some undisclosed mental illness.  Similarly, the inference that whatever may have been said was in the nature of an ordinary negative reference -- albeit not about the technical skills that Thunelius considered relevant to the hiring decision -- and that it was certainly not the kind of extreme statement that would support a claim for tortious interference is supported by the fact that Thunelius himself did not consider the statement to be in any way disqualifying.

---

[3] Plaintiff did not oppose Smith's motion for summary judgment, which the Court granted.

[4] The transcript's reference to "John Cooper" evidently refers to Jonathan Koerber, a former Dreyfus executive.

In light of the clear circumstance that Thunelius's testimony, even if believed, is subject to multiple possible interpretations, the ruling sought by Plaintiff is so obviously unfair and prejudicial that it comes close to seeking judgment as a matter of law. In effect, Plaintiff asks for a ruling that the jury must accept not only the veracity of Thunelius's testimony, but Plaintiff's *interpretation* of Thunelius's testimony -- namely, that the only inference the jury may make is that Defendants said something tortious, implying falsely that he had some sort of mental illness, rather than conveying that Raedle had performed poorly at his job and eventually was terminated due to his difficult personality and poor interpersonal skills. Respectfully, this Court, even in granting Plaintiff's motion for a new trial, denied Plaintiff's motion for judgment as a matter of law. Plaintiff should not be allowed to obtain essentially the same benefit through an evidentiary ruling.

## II.     RAEDLE'S PERFORMANCE AT CAI IS RELEVANT AND ADMISSIBLE.

As set forth in each of the following sections, Raedle's performance at CAI is relevant for at least four purposes, each of which is independently sufficient to require admission of the evidence. First, Raedle's performance at CAI is relevant to what, if anything, Defendants said to Dreyfus. Second, Raedle's performance at CAI is relevant to Defendants' state of mind. Third, Raedle's performance at CAI is relevant to damages. Fourth, Raedle's performance may be admissible as impeachment or rebuttal evidence.

**A.** **Raedle's Performance Is Relevant to What Defendants May Have Said to Dreyfus.**

As set forth above, the jury should be free to reach its own conclusions as to what, if anything, Defendants said to Dreyfus. That determination should be based not just on Thunelius's testimony, but on the evidence as a whole.

Significantly, there is ample evidence that Raedle's performance at CAI suffered from precisely the types of defects alluded to by Thunelius -- namely, not that Raedle was unskilled at analysis, but rather that his poor communication and interpersonal skills compromised his value as an employee. For example, his 1998 annual review states, "As a seasoned member of the Asset Management team I feel he is capable of taking more of a leadership role." (Tr. Exh. 4 at 3.) His 1999 review is even more blunt:

> Responsiveness to requests for research thoughts and credit reviews was <u>poor</u>. Throughout much of the event in the long term care sector, and in particular with regards to our holdings in this group, <u>there was little communication</u>.
>
> Will's credit skills and judgment are unparalleled within the Group. However, his in depth knowledge is often not appreciated <u>due to the lack of written correspondence on his credits</u>. Regarding distressed credits, his skills also are unmatched within our Group, <u>but his ability to communicate his findings voluntarily needs improvement</u>.
>
> Due to <u>the lack of written correspondence</u> we are uncertain that the proper documentation for Will's credits exist.
>
> Without written communication, any proactiveness that may exist is greatly diminished.
>
> Given Will's experience, <u>we have hoped that he would emerge as a senior member and leader in the research team</u>. (Tr. Exh. 6 at 2-3.)

Moreover, these formal evaluations were consistent with Shaiman's own view of Raedle's performance problems, which (again) clearly stemmed from his personality rather than his technical competence (which, of course, makes them no less legitimately performance issues). (See Tr. at 209-91 ("Mr. Raedle is difficult, argumentative, didn't listen to direction, didn't take

direction well, didn't produce the work product that we had asked him to, didn't train people we gave him opportunities to do things and fretted those opportunities away.")

To make matters worse, Raedle responded poorly to constructive criticism -- quibbling (even at trial) with the fact that his performance reviews were critical or, when forced to concede that they were critical, disputing their accuracy (see Tr. at 233-36). Indeed, even after he was fired for his performance failings, Raedle continued to believe that he had done an "excellent job" (Tr. at 228). Cf. Iweala v. Operational Technologies Services, Inc., 634 F. Supp. 2d 73, 82 (D.D.C. 2009) (inability to accept constructive criticism was legitimate basis for termination); Tramble v. Columbia University, 1999 WL 61826, *12 (S.D.N.Y. Feb. 10, 1999) (every employer has right to give constructive criticism).

The fact that Raedle was, as Thunelius testified, a potential "problem employee" is likewise demonstrated by record evidence. For example, the trial record reveals that Raedle, without asking his direct supervisor, scheduled a trip for himself to Arizona that his supervisor ultimately cancelled as an unnecessary junket (see Tr. at 218-21). Rather than accept his supervisors' judgment, or even consider that they might have a legitimate point or that there was an honest disagreement, Raedle dismissed their views as "absurd" (Tr. at 222), in part because he "didn't trust" his colleague who was attending the conference to report back to him (Tr. at 224), and responded with a disgruntled memorandum which, he concedes, he sent because he "wanted to make a record" (see Tr. at 218-19).

All of this evidence is directly relevant to the jury's interpretation of Thunelius's testimony concerning what was said. Plaintiff wishes to argue that CAI told Dreyfus falsely that he had some form of mental illness. However, Thunelius's testimony is also consistent with CAI having provided an accurate accounting of Raedle's shortcomings as an employee. Precluding

the jury from hearing evidence as to those shortcomings would unfairly prejudice Defendants by predisposing the jury to accept Plaintiff's, rather than Defendant's, view of the proper interpretation of Thunelius's testimony.  As such, the probative value of evidence of Raedle's performance is high, and it should be admitted under Rules 401, 402, and 403.

**B.      Raedle's Performance Is Relevant to Defendants' State of Mind.**

Even if Raedle's poor performance were not relevant to what was said -- and it is -- it is also relevant, and independently admissible, to show Defendants' state of mind.  In particular, Plaintiff has sought a jury instruction stating that Plaintiff must prove either that Defendants "acted with the sole purpose of injuring the plaintiff" or "conveyed a serious intentional misrepresentation of fact to Dreyfus".  As such, Plaintiff has directly (and necessarily, on a claim for tortious interference) placed Defendants' state of mind in issue, and Defendants cannot fairly be denied the right to put in crucial evidence concerning their state of mind, including evidence concerning Raedle's performance.

Raedle's poor performance at CAI is relevant to CAI's state of mind for at least two reasons.  First, even if the jury concludes that CAI did say something negative to Dreyfus concerning Raedle's mental state (including possibly that he engaged in poor interpersonal behavior or was a "problem employee"), the jury can also fairly conclude that that statement was *intended to be true* (and, indeed, was true) because Raedle did in fact exhibit such problematic behavior at CAI.  See Matthews v. Wisconsin Energy Corp. Inc., 534 F.3d 547, 559 (7th Cir. 2008) (plaintiff failed to prove former employer's reference was retaliatory where statements were truthful).

Second, the fact that CAI had true information that Raedle was a poor employee supports the inference that whatever may have been said was said not for the sole purpose of

injuring Raedle, but rather for the purpose (sole or otherwise) of providing a truthful response to an inquiry. Cf. White v. Nicholls, 44 U.S. 266, 287-88 (1845) ("if the conduct of the defendant entirely consists of an answer to an inquiry, the absence of malice will be presumed, unless the plaintiff produces evidence of malice"). Indeed, the jury is entitled to consider that, even if CAI *had* intended to harm Raedle, it would have made little sense to make up falsehoods concerning mental illness, when CAI was in possession of truthful and relevant negative information concerning Raedle's performance. (Of course, it is precisely such true, relevant, and negative information that Shaiman provided in response to another call for a reference, responding that working with Raedle was not a "pleasant experience"; Tr. at 295-96.)

Accordingly, if Plaintiff's Motion is granted, Defendants will be unfairly precluded from putting on their case and contesting Plaintiff's proposed finding of malicious intent, while there will be no opportunity for Defendants' to put on evidence of their own innocent intent. As such, evidence of Raedle's performance is relevant and admissible under Rules 401, 402, and 403.

**C.     Raedle's Performance Is Relevant to Damages.**

Raedle's poor job performance is also independently relevant and admissible as to damages. In particular, even if Raedle had gotten a job offer from Dreyfus, it is undisputed that nothing would have been guaranteed beyond the first year. Raedle, however, seeks damages for both salary and discretionary bonuses for the full four years until his putative group at Dreyfus was terminated (and, indeed, beyond that time frame). As such, he must prove that he would have earned those monies -- *i.e.*, that his performance would have justified (a) Dreyfus continuing to employ him, and (b) Dreyfus paying him the large hypothetical bonuses that he seeks as part of his damages claim. Therefore, Raedle's poor performance at CAI is directly

relevant to his damages claims because it demonstrates that he lacked the skills (including interpersonal and communication skills and the ability to respond productively to criticism) and other characteristics to maintain a job at Dreyfus or to earn the enormous discretionary bonuses that he seeks. Likewise relevant is his track record of receiving no discretionary bonus from CAI in 2001 and bonuses that were but a fraction of what he claims he was entitled to for previous years (e.g., Tr. at 216-17, 228).

Plaintiff's Motion incorrectly seeks to exclude evidence of Raedle's poor performance at CAI for the purpose of assessing his potential performance at Dreyfus as inadmissible propensity evidence under Fed. R. Evid. 404. Plaintiff misapprehends the nature of Rule 404's exclusion of character evidence. The character-evidence exclusion contained in Rule 404(a) provides in relevant part: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion". Thus, if Raedle had received an offer at Dreyfus, and Defendants sought to prove that he in fact performed badly at Dreyfus because he performed badly at CAI -- i.e., that he performed in conformity with his character for poor performance on the particular occasion of his employment at Dreyfus -- that might well be a prohibited inference barred by Rule 404(a). That simple proposition is all that is established in the case cited by Plaintiff, Zubulake v. UBS Warburg LLC, 382 F. Supp. 2d 536 (S.D.N.Y. 2005). See Plaintiff's Brief at 4 (describing Zubulake as "barring evidence of an employee's bad performance at a prior job to support a claim of bad performance *at a subsequent job*"; emphasis added).

However, there was no job offer from Dreyfus, and therefore no "specific occasion" on which Defendants are seeking to show "action in conformity". Rather, Defendants are seeking to prove that Raedle lacked the abilities and characteristics to succeed at the job he

sought -- or at least that he lacked the ability to succeed as greatly as he contends he would have and to earn the large discretionary bonuses he seeks. Indeed, given that a large part of Raedle's claim is for discretionary bonuses, it is difficult to imagine how he could prove such a claim without offering evidence of his job skills and other relevant employment characteristics.[5] There can be no evidence more relevant to that inquiry than his actual performance in his immediately preceding, and similar, job.[6]

This distinction -- that Rule 404 bars evidence of performance at one job to show performance at another job, while permitting evidence of performance at one job to show skills for a job that was never obtained -- is in accord with the purposes of Rule 404. As the Advisory Committee Notes to Rule 404 explain, character evidence is forbidden because "[i]t tends to distract the trier of fact from the main question of *what actually happened on the particular occasion*." Fed. R. Evid. 404, Notes of Advisory Committee on Rules (1975) (quoting Cal. Law Revision Comm'n, Rep., Rec. & Studies, 657-658 (1964)). In the former case, there should be direct evidence of what actually happened on the particular occasion, namely, how the employee performed in the later job. In this case, however, there is no evidence of how Raedle performed at Dreyfus, because he never obtained a job at Dreyfus. As such, both sides will necessarily have to resort to indirect evidence to prove whether Raedle would have kept a job at Dreyfus for four years and earned large discretionary bonuses, as he claims.

This sort of evidence -- looking at past conduct of a plaintiff to determine how much the plaintiff would have earned -- is actually routine in other contexts. For example, in

---

[5] At the first trial, Raedle offered evidence concerning bonuses paid to the person actually hired for the position he sought. Such evidence is obviously irrelevant, speculative, and prejudicial, and Defendants intend to object to its admission on retrial.

[6] By offering evidence to contest Raedle's claim that he would have earned large discretionary bonuses, Defendants do not concede that such a claim is cognizable. Indeed, Raedle's claim for discretionary bonuses is inherently speculative and, accordingly, should fail as a matter of law.

claims for lost business profits by plaintiffs who have lost the benefit of a contract, plaintiffs are permitted, if not required, to submit evidence of their past "track record" of business success. For example, in Homkow v. Musika Records, Inc., 2009 WL 721732 (S.D.N.Y. Mar. 18, 2009), plaintiff, the creator of a CD of historical music, sued his producer for breach of a contract to produce the CD and related torts. The court rejected plaintiff's claim for lost profits from the CDs, relying in part on the fact that plaintiff had "no track-record of sales". Id. at *11. See also Metz v. United Technologies Corp., 754 F.2d 63, 69-70 (2d Cir. 1985) (denying accident victim damages for future business profits where plaintiff was on poor terms with his partner and two-year-old business "had established virtually no track record of earnings"); 4A N.Y. Prac., Com. Litig. in New York State Courts § 80:69 (2d ed.) ("The value of business diverted through tortious interference often will have to be established by expert testimony, based in part upon the plaintiff's prior experience with such ventures.").

Raedle's claim depends on proof that he would have kept a job at Dreyfus for four years and earned large discretionary bonuses for three of those years. As such, his jobs skills and his ability to perform successfully in an analyst position (including his interpersonal skills and ability to impress superiors making bonus determinations) are critical, relevant evidence. The central relevance of this evidence may be demonstrated by the following thought experiment: If the jury were instructed, "Raedle has offered no evidence that he possessed the skills or track record to maintain and succeed in the job at Dreyfus", it is almost inconceivable that the jury would find for him on his claim for discretionary bonuses (or even salary beyond the first year). As such, it is implicit in Raedle's claim that he will be introducing such evidence -- and Defendants will be unfairly prejudiced if they are not able to respond in kind with directly relevant evidence as to Raedle's skills and professional track record.

### D. Raedle's Performance May Be Admissible as Rebuttal or Impeachment Evidence.

Depending on the evidence offered by Plaintiff in his direct case, Raedle's performance, evaluations, and track record may be admissible as rebuttal or impeachment evidence. It is premature for the Court to rule on the use of such evidence at this time.

### III. SHAIMAN'S TESTIMONY CONCERNING HIS SON IS RELEVANT AND ADMISSIBLE.

Plaintiff also seeks exclusion of testimony by Shaiman concerning his son, a young adult who has behavioral and other special needs, and has been in the care of a behavioral psychologist for most of his life (see Tr. at 594). However, this evidence is relevant and admissible for at least two, independent reasons.

First, Shaiman's close personal experience with mental illness is directly relevant to his state of mind. In particular, Plaintiff claims (as reflected in his proposed jury charges) that Shaiman accused him of having mental issues and that this was done with the sole *purpose* of harming Raedle or that it constituted a serious *intentional* misrepresentation. In either case, Shaiman's state of mind is directly relevant to Plaintiff's claim. As such, Defendants must be allowed to introduce relevant evidence concerning Shaiman's state of mind, and his sensitivity to issues of mental illness is therefore critical, relevant evidence. As such, it is admissible under Rule 402. Moreover, in light of the great relevance of this testimony, Plaintiff's Rule 403 objection is not well-founded. Contrary to Plaintiff's argument, there is little risk of the jury ruling for Shaiman out of sympathy. For example, he has not testified concerning details of his son's condition, which arguably might elicit sympathy, but rather testified only in general terms to the reason for his sensitivity to issues of mental illness. Finally, because Shaiman's feelings for his son are relevant to his state of mind, Plaintiff's objection under Rule 404 is beside the

point, because the evidence proves something entirely separate from the character inference of whether he behaved in a certain way on a given occasion. <u>See</u> Fed. R. Evid. 404(b).

Second, while the relevance of testimony to Shaiman's state of mind is itself sufficient to require its admission, the testimony concerning Shaiman's son is also relevant to whether Shaiman in fact stated that Raedle had mental issues. Again, Plaintiff's character-evidence objection is not well-founded, in this case because Shaiman's testimony concerning his son is not evidence of Shaiman's "character or a trait of character". Fed. R. Evid. 404(a). Indeed, Plaintiff does not claim that it is, tellingly arguing only that it is "comparable to inadmissible character evidence under FRE 404(a)" (Pl. Br. at 6). "Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness." 1 McCormick On Evid. § 195 (6th ed.).

Here, Plaintiff identifies no such "general trait" that evidence concerning Shaiman's son is offered to prove. Even if it is interpreted as evidence that Shaiman is sensitive to the pain that can be caused by careless references to mental illness, that hardly suggests a "general trait", such as "sensitivity" generally -- manifestly, a person may have a personal experience that makes him or her sensitive to mental illness, and still be insensitive generally, insensitive to the poor, insensitive to racial minorities, insensitive to any number of people. <u>Cf.</u> McCormick, <u>supra</u> ("If we speak of a character for care, we think of the person's tendency to act prudently in all the varying situations of life--in business, at home, in handling automobiles and in walking across the street. A habit, on the other hand, is the person's regular practice of responding to a particular kind of situation with a specific type of conduct."). The evidence concerning Shaiman's son is much more specific than evidence of a general trait -- rather, it offers a clear, concrete, and specific insight into the workings of Shaiman's mind that will help

the jury to decide if in fact he said what Plaintiff alleges. As such, it is clearly admissible for what occurred (in addition to for Shaiman's state of mind). Cf. Harold v. Cendo, 131 F.3d 134, 1997 WL 734028 (4th Cir. 1997) (doctor could not remember advising other doctor not to operate, but was permitted to testify that it was his "invariable practice" to so advise under the circumstances presented); Burchfield v. CSX Transp., Inc., 2009 WL 1405144, *3 (N.D. Ga. May 15, 2009) (where plaintiff did not recall setting handbrake, admitting plaintiff's testimony that he "would have" set it because that is "what we were taught"); Fuller v. Summit Treestands, LLC, 2009 WL 1874058, *4 (W.D.N.Y. May 11, 2009) (where plaintiff did not recall events of day in question, admitting plaintiff's testimony as to what he had done on other occasions to prove what had happened that day); United States v. Bifulco, 2007 WL 1288214, *4 (W.D.N.Y. May 1, 2007) (admitting attorney's testimony that "it is his routine habit and practice to advise a client of his right to testify, and although he does not specifically recall advising petitioner of this right, he is confident he did so in this case as well").

Finally, the Court should reject Plaintiff's request for discovery concerning Shaiman's son's medical records. This invasive request -- seeking privileged, and potentially embarrassing, medical records concerning a young person with special needs and who is non-party to this litigation -- is clearly nothing more than harassment and intimidation, especially in light of the fact that Defendants have not sought to introduce specifics concerning Shaiman's son's condition. Plaintiff may, within appropriate bounds, cross examine Shaiman concerning his son, but there is absolutely no basis for requiring production of his son's confidential medical records. See generally Fed. R. Evid. 501 (issues of privilege determined by state law in diversity action); 44 N.Y. Jur. 2d Disclosure § 25 ("Nor may disclosure of medical records be permitted if

the disclosure includes confidential records of third parties who have not waived their right to keep such records confidential.").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion should be denied in its entirety.

Dated: New York, New York
       March 8, 2010

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP


By: _____/s/_____
     David A. Berger (dberger@abv.com)
     Michael S. Vogel (mvogel@abv.com)
     Cornelius P. McCarthy (cmccarthy@abv.com)
     Kevin L. MacMillan (kmacmillan@abv.com)

111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

Attorneys for Defendants
Credit Agricole Indosuez and Lee Shaiman